# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **IRMA J. JAMISON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:18-CV-00263 PLC** |
| | ) | |
| **ANDREW M. SAUL,** [1] | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Irma J. Jamison seeks review of the decision of the Social Security Administration (SSA) denying her application for Disability Insurance Benefits under the Social Security Act. For the reasons set forth below, the case is reversed and remanded.

### I.     Background and Procedural History

Plaintiff, who was born in February 1959, applied for Disability Insurance Benefits on December 8, 2014. (Tr. 10). In her application, Plaintiff claimed she was disabled as of January 25, 2014 as a result of:  cervical fusion, herniated disc lumbar spine, arthritis in knees, lumbar radiculopathy, diverticulitis, migraines, and acid reflux.  (Tr. 162-68, 182)  The SSA denied Plaintiff's claim, and she filed a timely request for a hearing before an administrative law judge (ALJ).  (Tr. 64-75, 155-57)

The SSA granted Plaintiff's request, and an ALJ conducted a hearing in December  2016. (Tr. 12, 36-63) In a decision dated March 7, 2017, the ALJ determined that Plaintiff "has not

---

[1] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

been under a disability within the meaning of the Social Security Act from January 25, 2014, through the date of this decision." (Tr. 19-20)

In her decision, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520, and found that Plaintiff had the following severe impairments: "degenerative disc disease (DDD), degenerative joint disease, obesity, tarsal tunnel syndrome, and peroneal tendinitis." (Tr. 36-63) The ALJ determined that Plaintiff had the residual functioning capacity (RFC) to:

> [P]erform a range of light work as defined in 20 CFR 404.1567(b) in that she can lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand or walk for 3 hours in an 8-hour workday; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; no exposure to extreme cold, unprotected heights, or hazardous machinery.

(Tr. 14) At step four of the sequential evaluation, the ALJ found that Plaintiff could return to her past work as a customer service representative. (Tr. 19-20)

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on January 12, 2018. (Tr. 1-6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.    Evidence Before the ALJ

### A. Testimony

Plaintiff testified that she was fifty-seven years old and had a high school education and some technical school. (Tr. 48) Plaintiff lived with her daughter and grandchildren, who did "all the chores around the house." (Id.)

Plaintiff worked for AT&T for fifteen years, most recently as a supply attendant. (Tr. 40, 45, 49) In that position, she operated a forklift to load the truck or van she was driving and then transported the products to "technicians in the field." (Id.) Prior to becoming a supply attendant,

Plaintiff worked as a senior consultant, or customer service representative, for AT&T. (Tr. 42) Plaintiff left that position because she was suffering vertigo. (Tr. 44)

Plaintiff testified that she could not work because

Due to the neck surgery, I have problem...turning my head some days, swallowing. My arms give out, my hands tingle....I have pains that go down in my knees. If I don't take my medication, I burn from my waist down and it goes all between my legs, down in my feet...I have canes and stuff, but I can't use my canes because...some days I don't have the strength.

(Tr. 49) Plaintiff explained that she was unable to turn her head "side to side" because "I have the clicking like the hardware get hung up." (Tr. 49) Her doctors were discussing the possibility of a "removal surgery" and "bone shaving" at the C7 level. (Tr. 50)

Plaintiff described intermittent, daily numbness and tingling in her arms. (Tr. 50) Plaintiff stated that she could lift "maybe a gallon of milk at the most...[j]ust once or twice." (Tr. 50-51) Some days she was unable to comb her hair. (Tr. 50) If she attempted to push or pull, her arms "g[a]ve out," and she was unable to "grip stuff" due to numbness and lack of strength. (Tr. 51)

Plaintiff testified that her pain was currently "coming down the back of my head going into my shoulders, into my biceps and my fingers are tingling. I have it in my knees and my right foot is like it's short circuiting my toes." (Tr. 53) Plaintiff's lower back pain was "just burning and it's on the top of my hip...[i]t goes down the right side, down into the hip, down into the knee, into the...leg, into the foot...." (Tr. 53) Plaintiff stated that the pain in her low back, knees, and feet was constant. (Id.) Pain medications reduced the pain to "a numbness," but they made her "foggy" and forgetful. (Id.) She was currently taking Percocet, gabapentin, and Mobic. (Id.)

Plaintiff estimated she could walk "about ten minutes" before needing to take a break, stand ten to fifteen minutes, and sit ten to fifteen minutes. (Tr. 55) Plaintiff explained that her

doctors prescribed her a cane, which she used once or twice a day. (Tr. 56-57) Plaintiff elaborated: "I would use it more, but my hands give out, so it's either take the chance of falling without or with it and I just take the chance without because I got a metal cane and I fall on it, that's not good either." (Tr. 57)

A vocational expert also testified at the hearing. (Tr. 60) The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's age, education, and work history who was "limited to work at the light exertion level in that they can lift, carry, push, or pull 20 pounds occasionally, 10 pounds frequently; sit for six hours in an eight-hour workday; but can only stand or walk for three hours total in an eight-hour workday." (Id.) The vocational expert stated that such person could perform Plaintiff's past work as a customer service representative. (Tr. 61) When the ALJ added to the hypothetical that "the individual would be unable to keep the neck in a stable position for more than 30 minutes and thus would need to take an additional 10-minute break after that period," the vocational expert stated that such person would not be able to perform any jobs in the national economy. (Id.) In response to Plaintiff's counsel's question, the vocational expert testified that, if the first hypothetical individual could "only occasionally use their hands for fine manipulation or gross manipulation," she would not be able to perform the customer service position. (Id.)

## B. Relevant medical records

In early January 2014, Dr. Thomas Forget, a neurosurgeon, ordered an MRI of Plaintiff's lumbar and cervical spine. (Tr. 492). The MRI revealed: "(1) multilevel degenerative changes of the lumbar spine, unchanged since the prior study; (2) annular tear identified at the posterior aspect of the L4-L5 disc; [and] (3) multilevel foraminal and lateral recess stenosis...." (Tr. 494)

Later that month, at an appointment with her primary care physician, Dr. Marketa

Kasalova, Plaintiff complained of fatigue and stated that "she is worried that she will lose her job due to her chronic neck and low back pain."  (Tr. 351)  Dr. Kasalova diagnosed Plaintiff with cervical radiculopathy, generalized anxiety disorder, depressive disorder, and hyperlipidemia. (Tr. 352)

Two days later, Plaintiff had a follow-up appointment with Dr. Nabil Ahmad, a pain management specialist.[2]  (Tr. 495)   Plaintiff complained of neck, back, leg, and right arm pain. (Tr. 495)   Plaintiff reported she "was still having pain in her lower back and bil[ateral] legs worse than before injections."  (Id.)  Plaintiff's pain was "constant" and she rated it at a four to six on a ten-point scale.  (Id.)  A physical examination revealed:  tenderness and reduced range of motion in her neck; tenderness to palpation and mildly reduced range of motion on bilateral rotation in her cervical spine; tenderness to palpation and mildly reduced range of motion of the lumbar spine; positive straight-leg raise, FABER, and Gaenslen tests on the right; and bilateral knee crepitus.  (Tr. 498)  Dr. Ahmad diagnosed the following: "cervical radiculopathy, cervical spondylosis, HNP (cervical),  lumbar spondylosis, lumbar degenerative disc disease, lumbar radiculopathy, sacroiliitis, low  back pain, and osteoarthritis knee." (Tr. 499-500).

In  February  2014,  Dr.  Ahmad  administered  a  "L5  transforaminial  epidural  steroid injection" and a "sacroiliac joint injection."  (Tr. 500)  Dr. Ahmad noted:  "The injections don't last long."   (Id.)   Dr. Ahmad placed Plaintiff on light duty, stating "[h]er restrictions are permanent," scheduled knee Synvisc injections, ordered physical therapy, and recommended at-home exercises.  (Tr. 500)  Five days later, Dr. Ahmad administered knee joint injections.  (Tr. 501)

When  Plaintiff  presented  to  Dr.  Kasalova  in  late-February  2014,  she  reported  that  the

_____

[2] This is the earliest treatment record from Dr. Ahmad.  However, according to Dr. Ahmad's medical source statement, he first treated Plaintiff on December 13, 2012.  (Tr. 487)

weekly knee Synvisc injections helped "some." (Tr. 353) Plaintiff complained that Tramadol was not controlling her cervical pain and made her sleepy. (Tr. 353) Dr. Kasalova provided Plaintiff a sample of Lyrica and instructed her to follow up with her orthopedic surgeon. (Tr. 353-54)

Plaintiff returned to Dr. Forget's office in early April 2014. (Tr. 248) Plaintiff complained of "extreme" neck pain "localized at the posterior cervical region that has been present for 2 weeks. It is extreme (9-10/10) and radiates into the right and left arm in a non-specific distribution." (Id.) Additionally, Plaintiff reported an acute onset of weakness in her right tricep. (Tr. 252) Plaintiff informed Dr. Forget that she recently began taking Lyrica, "which has improved the global pain." (Id.) Upon examination, Dr. Forget noted limited range of motion in Plaintiff's cervical spine, normal range of motion in her right and left upper and lower extremities, and weakness in her right upper extremity. (Tr. 250). Dr. Forget wrote a letter to Dr. Ahmad recommending another MRI. (Tr. 252)

Plaintiff underwent an MRI in April 2014, which revealed : "[d]egenerative changes at C4-C5, C5-C6 and C6-C7" and "[c]entral spinal canal stenosis…, most pronounced at C6-C7 with flattening of the spinal cord." (Tr. 254). At Plaintiff's next appointment with Dr. Kasalova in May 2014, she complained of ankle swelling on the right side and neck pain. (Tr. 355) Dr. Kasalova recommended weight loss and continued Plaintiff's medications. (Id.)

Dr. Donald deGrange, an orthopedic surgeon, examined Plaintiff in late-May 2014.[3] (Tr. 379) Dr. deGrange noted that Plaintiff's chief complaint was "mechanical neck pain at the base of the neck extending into both shoulders, usually worse on the right than the left as well as the

---

[3] In regard to this change in Plaintiff's treating orthopedic surgeons, Dr. deGrange wrote that Plaintiff "has been a long-time patient of Dr. Forget and had a consultation with him in March 2014….Upon follow up, there was some mention or involvement of Workers' Compensation, at which time Dr. Forget referred her to our practice." (Tr. 379)

pain, tingling, numbness, and weakness that has appeared in the last several weeks." (Id.) Plaintiff informed Dr. deGrange that she had "dropped several items…because of unexpected weakness of grip and has actually gotten stuck in the bathtub on a couple of occasions unable to pull herself out because of the weakness in her arm." (Id.) Dr. deGrange noted that Plaintiff experienced "no significant improvement" from physical therapy and "no significant or sustained benefit" from a series of epidural injections administered by Dr. Ahmad. (Id.)

Plaintiff returned to Dr. deGrange's office in mid-July 2014 "[h]aving failed prolonged and appropriate conservative care[.]" (Tr. 387) Dr. deGrange noted that Plaintiff's recent MRI showed "2 large disc herniations with severe stenosis of C4-5 and C5-6 corresponding to the patient's symptoms." (Id.) Dr. deGrange performed an elective decompression and fusion at C4-5 and C5-6. (Tr. 431) Following the procedure, Dr. deGrange applied a cervical collar and prescribed Percocet. (Tr. 433, 435). When Plaintiff followed up with Dr. deGrange eleven days later, she complained of "the normal surgical pain in the cervicothoracic junction," but reported that her "arms and hands feel better noticeably." (Tr. 392)

In August 2014, Plaintiff followed up from her cervical spine fusion with Nurse Practitioner (NP) Eileen McKeon at Dr. Kasalova's office. (Tr. 338) Plaintiff reported that her "neck pain is much better." (Tr. 340) NP McKeon noted that Plaintiff was "moving all extremities equally strong" and advised Plaintiff to discuss all pain management and medication with Dr. deGrange. (Tr. 339).

At Plaintiff's follow-up appointment in September 2014, Dr. deGrange wrote that Plaintiff's "neck continues to improve," "[h]er arms and hands feel much better," and "[s]he has no residual numbness or tingling,"but she "still is having some difficulty swallowing. (Tr. 394) Plaintiff only required her pain medicine "a couple of days a week." (Id.) Dr. deGrange observed

"excellent strength in both upper extremities," and they discussed the possibility of Plaintiff returning to work "depend[ing] upon her continued progress." (Id.)

When Plaintiff saw Dr. deGrange the following month, she reported "some improvement in her neck and shoulder pain as well as the hand symptoms, but she does have some tingling that persists on the fingertips of both hands." (Tr. 395) Plaintiff also complained of "issues regarding her back and involuntary plantar flexion that happened during the night[.]" (Id.)

At her follow-up appointment with Dr. deGrange in early November 2014, Plaintiff complained of difficulty swallowing and she "still has a stiff neck and some occasional numbness and tingling in the hands, but that is slowly and steadily improving." (Tr. 397) Plaintiff was "usually able to lift about five or 10 pounds occasionally" and she exhibited no focal motor or sensory deficits. (Id.)

Based on that examination, Dr. deGrange completed an "AT&T Integrated Disability Physical Capacities Evaluation" for Plaintiff in November 2014. (Tr. 398) Dr. deGrange characterized Plaintiff's level of functioning as "moderate level of disability and dysfunction." (Tr. 399) Dr. deGrange opined that Plaintiff could: sit thirty to forty-five minutes; stand fifteen to twenty minutes; walk fifteen to twenty minutes; and view a computer screen fifteen to twenty minutes. (Id.) Plaintiff could occasionally lift a maximum of five pounds, but never above the waist. (Tr. 400)

Additionally, Dr. deGrange stated that Plaintiff could "rarely" climb stairs due to "severe knee arthritis," rarely bend, rarely kneel because "requires help to get up," and occasionally flex/extend neck or walk on uneven ground. (Tr. 402-03) Plaintiff could perform "simple grasping" with both hands "continuously," and she could occasionally use both hands for "fine manipulation," pushing/pulling, and reaching. (Tr. 404) Dr. deGrange estimated that Plaintiff

would require breaks "every hour twenty minutes." (Tr. 406) Finally, Dr. deGrange wrote that Plaintiff's restrictions were "permanent," but he would reassess her restrictions on December 1, 2014. (Id.)

In early December 2014, Plaintiff presented to Dr. Ahmad for "bilateral shoulder pain, back pain, and some knee pain." (Tr. 373) Dr. Ahmad noted that Plaintiff's neck and shoulder pain "radiates down the posterior arm and into the palmar aspect of hand and 3rd/4th digits on the right. She has some numbness in these digits as well." (Id.) Dr. Ahmad wrote that Plaintiff's "[l]ower back pain is a burning pain and is wors[e] with overactivity or sitting prolonged periods of time. Pain is shooting down bilateral legs past the knee in the L5-S1 dermatone – burning pain with electrical shock sensation…." (Id.) Dr. Ahmad stated that Plaintiff's most recent MRI showed changes of foraminal stenosis at L4-5, L5-S1, with disc protrusion and facet arthropathy. (Id.)

Upon physical examination of Plaintiff's cervical spine, Dr. Ahmad observed tenderness to palpation and spasm in the paravertebral muscles, restricted range of motion in all planes, trapezius tenderness bilaterally, and positive myofascial trigger points on the left and right. (Tr. 373) As to Plaintiff's lumbar spine, Dr. Ahmad noted "abnormal sacroiliac joint mobility bilaterally," limited extension, positive Patrick's on the right, and positive FABER/figure-of-four tests on right. (Tr. 374). Plaintiff's shoulders and thoracic spine had normal ranges of motion. (Id.) Noting that Dr. deGrange was managing Plaintiff's Percocet, Dr. Ahmad decided to "supplement pain management control with TENS unit and topical cream." (Tr. 474) Dr. Ahmad continued Plaintiff's Lyrica and prescribed cyclobenzaprine, flurbiprofen, baclofen, and gabapentin. (Tr. 474) Finally, Dr. Ahmad administered knee joint injections and recommended a repeat epidural steroid injection in the lumbar spine when Plaintiff healed from cervical surgery.

(Id.)

Dr. deGrange examined Plaintiff approximately one week later in December 2014. (Tr. 409) Dr. deGrange wrote that Plaintiff "has multiple somatic complaints today with some numbness and tingling in the arms and fingers. She still has some difficulty swallowing but is moving her head better and appears clinically to be much improved despite the subjective." (Id.) Dr. deGrange also observed: "There is some mild give-way weakness in terms of bilateral elbow flexion and extension, grip strength, and wrist extension." (Id.)

Dr. deGrange stated that Plaintiff's x-rays showed "radiographic healing, and she can be safely discharged from the practice." (Tr. 409) In regard to her ability to return to work, Dr. deGrange wrote:

> I understand that there are some significant and heavy demands regarding her employment. It is highly unlikely that she is going to be able to return to those based upon her current physical condition. I would contemplate as regards permanent limitations placing her in a medium demand capacity as defined by the Department of Labor Dictionary of Occupational Titles. She would meet the criteria for a light/medium demand capacity indicating that on a constant basis she can lift, carry, push, and pull five pounds, frequently up to 15 pounds, and occasionally up to 25 pounds.

(Tr. 409-10) Dr. deGrange concluded: "No further testing is required and no medications or treatments after today are indicated." (Tr. 410)

Plaintiff also saw NP McKeon for back and leg pain later that month. (Tr. 481) Plaintiff described "low back pain radiating to buttocks and down both legs to feet, both sides, twitching to right leg, feels crawling sensation to right leg. Onset 3-4 weeks ago and persisting. She reports pain shoots out of great toe on both sides with right being worse than left." (Id.) Plaintiff was taking Percocet and Lyrica for pain "with little relief." (Id.) Upon examination, NP McKeon noted decreased range of motion and paraspinal tenderness in Plaintiff's cervical spine area. (Tr. 482)

In March 2015, Plaintiff presented to NP McKeon with complaints of dizziness, forgetfulness, and "feeling anxious mostly due to her memory or thought process." (Tr. 524) NP McKeon attributed these feelings to Plaintiff's recently "increased and large dose of Lyrica." (Tr. 526)

Dr. Ahmad completed a medical source statement (MSS) in April 2015.[4] (Tr. 487-90) Dr. Ahmad listed Plaintiff's diagnoses as: knee degenerative joint disease, cervical radiculitis, neck pain, lumbar radiculopathy, and low back pain. (Tr. 487) Dr. Ahmad opined that Plaintiff could sit for one hour and stand/walk one hour in an eight-hour workday. (Id.) Plaintiff could not perform repetitive motion tasks, but she was able to use her hands for simple grasping and fine manipulation. (Id.) Dr. Ahmad stated that Plaintiff could occasionally lift/carry five pounds, but never lift/carry more than five pounds. (Id.)

In July 2015, Plaintiff presented to Dr. Ahmad with neck pain and complained that her "[h]ead gets stuck in one position." (Tr. 556) Plaintiff described her pain as "aching and throbbing. The pain radiates to the left shoulder, left upper arm, left forearm, left hand, left fingers, right shoulder, right upper arm, right forearm, right hand, and right fingers." (Id.) Plaintiff's average pain was a seven and, at its worst, it was a ten. (Id.) On physical examination, Dr. Ahmad noted: cervical spine was tender to palpation and had "palpable trigger points"; pain with lumbar extension; pain "over lumbar intervertebral spaces (discs) on palpation"; and right and left sided pain on palpation of the bilateral sacroiliac joint area." (Tr. 557) Upon examination of Plaintiff's extremities, Dr. Ahmad noted: pain, crepitation, mild effusion, and tenderness to palpation in both knees; and decreased sensation in right arm and right ankle. (Tr. 557)

---

[4] In the MSS, dated April 6, 2015, Dr. Ahmad stated that he last examined Plaintiff on April 1, 2015. (Tr. 487) Records from this examination do not appear in the record.

Plaintiff followed up with Dr. Ahmad in August 2015 and reported knee pain, left knee swelling, and low back pain.  (Tr. 553)  Plaintiff's physical examination was similar to that of July 2015.  (Tr. 554)  Plaintiff informed Dr. Ahmad that her meloxicam caused nausea and Lyrica made her feel "sedated."  (Tr. 553, 555)  Dr. Ahmad scheduled Plaintiff for a left knee steroid injection, renewed her Norco, and continued her other medications.  (Tr. 555)  Dr. Ahmad administered the knee joint injection in September 2015.  (Tr. 550)

In January 2016, Plaintiff contacted Dr. deGrange's office at her primary care physician's recommendation.  (Tr. 643)  Plaintiff reported "pain in the back of her neck and into her L arm and fingers" and "weakness where she cannot open things."  (Tr. 643)  In February 2016, Plaintiff underwent a CT cervical spine, which revealed:  "Status post C4-C5 and C5-C6 anterior cervical discectomy and fusion.  Central C6-C7 disc herniation is suspected.  No evidence of pseudoarthrosis."  (Tr. 64)  Plaintiff called Dr. deGrange's office later that month to advise that "she is now hav[ing] trouble with her L leg."  (Tr. 646)

Plaintiff returned to Dr. deGrange's office in mid-March 2016.  (Tr. 638)  Dr. deGrange wrote that Plaintiff was "doing quite well" until October "when she started noticing some swelling and stiffness in her neck.  That has progressed over the ensuing months, and she now has neck pain with left upper extremity pain, tingling, and numbness into the ulnar aspect and hypothenar imminence of the left hand.. . .She has some numbness and tingling in her right upper extremity[.]"  (Id.)  Upon examination, Dr. deGrange observed "some mild weakness of left hand grip strength, elbow extension, EPL and ADQ" and "sensation is decreased over the hypothenar imminence of the left hand."  (Id.)  Plaintiff's most recent CT revealed "solid fusion at C4-5 and C5-6 but noticeable degeneration with spurring and decreased disc space height as well as stenosis of a moderately severe degree on the left, all at C6-7."  (Id.)  Dr.

deGrange diagnosed Plaintiff with C6-7 degenerative disc disease with stenosis and prescribed physical therapy.  (Id.)

Plaintiff followed up with Dr. deGrange in April 2016.  (Tr. 625)  Dr. deGrange noted that Plaintiff "has had a very good response with therapy after six visits" and the range of motion in her cervical spine had improved.  (Id.)  Plaintiff informed Dr. deGrange that she "still has pain and some stiffness in the neck," and she recently "had a choking fit" that "lasted for quite some time."  (Id.)  A CAT scan confirmed a solid fusion, "but she does have the large bone spur in front of C6-7."  (Id.)  Dr. deGrange and Plaintiff discussed "a hardware removal at C4-5 and C5-6."  (Id.)  Plaintiff asked whether "while we are in there if we can just take the bone spur off at C6-7," but she decided to "hold off for the time being."  (Id.)  Dr. deGrange referred Plaintiff to an ENT specialist.  (Id.)

Plaintiff returned to Dr. deGrange's office in early July 2016.  (Tr. 627)  Plaintiff reported continued "difficulty swallowing as well as some persistent neck and shoulder symptoms.  There is also a spot just to the midline of the left scapula, which no doubt is cervical in origin."  (Id.)  Dr. deGrange diagnosed tarsal tunnel syndrome in Plaintiff's right foot and noted that Plaintiff was "contemplating the foot surgery."  (Tr. 627)  Dr. deGrange wrote that Plaintiff "appears to be inclined toward the foot surgery now and perhaps later on in the summer or the autumn the neck surgery and hardware removal."  (Id.)

## III.    Standard for Determining Disability Under the Act

Eligibility for disability benefits under the Social Security Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability.  42 U.S.C. § 423(a)(1).  The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy ...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a Plaintiff to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

## IV. ALJ's Decision

The ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since January 25, 2014, the alleged onset date of disability; (2) had the severe impairments of degenerative disc disease, degenerative joint disease, obesity, tarsal tunnel syndrome, and peroneal tendinitis, and the non-severe impairments of general anxiety disorder and depression; and (3) did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 12-14)

The ALJ reviewed Plaintiff's testimony and the medical evidence and determined that, while her impairments "could reasonably be expected to cause some of the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are

not entirely credible for the reasons explained in this decision." (Tr. 15)  The ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform a range of light work with the following limitations:

> she can lift, carry, push, or pull 20 pounds occasionally and 10 pounds frequently; sit for 6 hours in an 8-hour workday; stand or walk for 3 hours in an 8-hour workday; never climb ropes, ladders, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; no exposure to extreme cold, unprotected heights, or hazardous machinery.

(Tr. 14) Finally, based on the testimony of the vocational expert, the ALJ determined that Plaintiff was capable of performing her past relevant work as a customer service representative and, therefore, was not disabled.  (Tr. 19-20)

## V.    Discussion

Plaintiff claims that the ALJ erred in evaluating the medical opinion evidence and determining her RFC.  [ECF No. 23]  More specifically, Plaintiff argues that the ALJ erred in the weight she assigned to Plaintiff's treating physicians, Dr. Ahmad and Dr. deGrange.  Defendant counters that substantial evidence supported the ALJ's assessment of the medical opinion evidence and the ALJ properly concluded that Plaintiff was not disabled.  [ECF No. 29]

### A.  Standard for Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Chesser v. Berryhill, 858 F.3d 1161, 1164 (8th Cir. 2017) (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)).  The Court must consider "both evidence that supports and evidence that detracts from the ALJ's decision, [but it] may not reverse the decision merely because there is substantial evidence supporting a contrary outcome."  Id. (quoting Warburton v. Apfel, 188 F.3d

1047, 1050 (8th Cir. 1999)).

The Court does not "reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determination are supported by good reasons and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)). T herefore, a Court must affirm the ALJ's decision "if it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings." Cruze v. Charter, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)); Wright v. Colvin, 789 F.3d 847, 852 (8th Cir. 2015) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)).

B.  Medical Opinion Evidence

Medical opinions are statements from physicians, psychologists, or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, and what the claimant can still do despite her impairments and physical or mental restrictions.  20 C.F.R. § 404.1527(a)(2).[5]  A treating physician's opinion regarding a plaintiff's impairments is entitled to controlling weight where "the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as [a] whole." Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (quotation omitted).

If an ALJ declines to give controlling weight to a treating physician's opinion, the ALJ

---

[5] Many Social Security regulations were amended effective March 27, 2017.  Per 20 C.F.R. § 404.1527, the Court will use the regulations in effect at the time that this claim was filed.

must consider the following factors in determining the appropriate weight: length and frequency of the treatment relationship; nature and extent of the treatment relationship; evidence provided by the source in support of the opinion; consistency of the opinion with the record as a whole; and the source's level of specialization. 20 C.F.R. § 404.1527(c). Whether the ALJ grants a treating physician's opinion substantial or little weight, "[t]he regulations require that the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (quoting 20 C.F.R. § 404.1527(d)(2)).

1. Dr. Ahmad

Plaintiff asserts that the ALJ erred in assigning "little weight" to Dr. Ahmad's medical opinion. Dr. Ahmad was Plaintiff's pain management specialist from December 2012 until April 2016. Plaintiff's medical records reveal that shortly after Plaintiff's January 2014 alleged onset date, Dr. Ahmad diagnosed her with: "cervical radiculopathy, cervical spondylosis, HNP (cervical), lumbar spondylosis, lumbar degenerative disc disease, lumbar radiculopathy, sacroiliitis, low back pain, and osteoarthritis knee." In February 2014, Dr. Ahmad administered an L5 transforaminal epidural steroid injection and Hyalgan knee joint injections.

Plaintiff underwent decompression and fusion at C4-5 and C5-6 in July 2014, after which Dr. deGrange, Plaintiff's orthopedic surgeon, and NP McKeon treated Plaintiff's pain. Dr. deGrange discharged Plaintiff in December 2014, and Plaintiff returned to Dr. Ahmad's practice the same month with bilateral shoulder pain, back pain, and knee pain. Dr. Ahmad completed a physical examination and reviewed Plaintiff's most recent MRI, which revealed changes of foraminal stenosis at L4-5, L5-S1, with disc protrusion and facet arthropathy. Physical examination of Plaintiff's cervical spine revealed tenderness and spasm in the paravertebral muscles, restricted range of motion in all planes, trapezius tenderness, and positive myofascial

trigger points.   In Plaintiff's lumbar back, Dr. Ahmad observed abnormal sacroiliac joint mobility bilaterally, "palpation + Patrick's on right," limited extension, negative straight leg raising test, and positive FABER test.   Dr. Ahmad administered Hyalgan knee joint injections, noted that Plaintiff continued to take Percocet, continued Plaintiff's Lyrica, and prescribed flurbiprofen, cyclobenzaprine, baclofen, gabapentin, a TENS unit, and topical cream.

Dr. Ahmad completed an MSS for Plaintiff in April 2015.  (Tr. 487)  Dr. Ahmad listed Plaintiff's diagnoses as:  knee degenerative joint disease, cervical radiculitis, neck pain, lumbar radiculopathy, and low back pain.  (Tr. 487)  Dr. Ahmad opined that Plaintiff could sit for one hour and stand or walk one hour in an eight-hour workday.  (Id.)  Plaintiff could not perform repetitive motion tasks, but she was able to use her hands for simple grasping and fine manipulation.  (Id.)  Dr. Ahmad stated that Plaintiff could occasionally lift/carry a maximum of five pounds.  (Id.)

The ALJ reviewed Dr. Ahmad's MSS and determined that it was "not supported by the record."  (Tr. 18)  In particular, the ALJ discredited Dr. Ahmad's opinion that Plaintiff was limited to lifting only five pounds occasionally, sitting for one hour per day, and standing or walking for one hour per day.  (Id.)  In support of her decision to assign "little weight" to Dr. Ahmad's opinion, the ALJ explained:

> Dr. Ahmad completed this form on April 6, 2015, indicating the claimant was last seen on April 1, 2015.  He also stated that the claimant had been under his care since December 13, 2012.  Treatment notes in evidence for December 4, 2014 indicate prior care, but that was almost a year after the claimant stopped working due to pain.  There is nothing in the record to indicate that the claimant was seen again prior to the opinion dated April 6, 2015.  Subsequent records indicate the claimant was seen several times later that year.  Not only is Dr. Ahmad's assessment inconsistent with the medical records as a whole, it is not supported by his own treatment notes.

(Tr. 18)

The ALJ's conclusory statement that Dr. Ahmad's opinion was not supported by his own treatment notes or the medical record as a whole did not constitute "good reason" for discrediting Dr. Ahmad's opinion. The ALJ failed to identify the objective medical evidence or inconsistencies that she relied upon in determining that Dr. Ahmad's opinion was not entitled to controlling, or even substantial, weight.

Contrary to the ALJ's finding, Plaintiff's medical records contain significant objective evidence supporting Dr. Ahmad's opinions. An MRI of April 2014, performed prior to Plaintiff's cervical surgery, showed: "degenerative changes at C4-C5, C5-C6, and C6-C7 not significantly changed since the prior study from 3/14/12" and "central spinal canal stenosis…, most pronounced at C6-C7 with flattening of the spinal cord." (Tr. 254) Five months after the surgery, in December 2014, Dr. Ahmad noted that Plaintiff's most recent MRI revealed changes of foraminal stenosis at L4-5 and L5-S1 with disc protrusion and facet arthropathy. (Tr. 373) A CT cervical spine of February 2016 showed "solid fusion at C4-5 and C5-6 but noticeable degeneration with spurring and decreased disc space height as well as stenosis of a moderately severe degree on the left, all at C6-7." (Tr. 576) A CAT scan in April 2016 showed a large bone spur at C6-7. (Tr. 625)

Physical examinations also supported Dr. Ahmad's opinion. In December 2014, both Dr. Ahmad and NP McKeon noted decreased range of motion and paraspinal tenderness. Physical examinations in July and August 2015, showed tenderness to palpation in cervical and lumbar spine, palpable trigger points in the muscles of the head and neck, pain with lumbar extension, and positive FABER tests on the left and right sides. At the same time, Plaintiff's knees exhibited tenderness to palpation, effusion, crepitations, and mild effusion, and she had decreased sensation in her right ankle. In March 2016, Dr. deGrange examined Plaintiff and

noted: moderate tenderness along the medial border of the left scapula; weakness of left hand grip strength and elbow extension; and decreased sensation in the left hand.

Dr. Ahmad's opinion was also consistent with his own treatment notes. When Plaintiff returned to Dr. Ahmad's care in December 2014, she presented with bilateral shoulder pain, back pain, and knee pain. On physical examination of Plaintiff, Dr. Ahmad noted: tenderness and reduced range of motion in the neck; tenderness to palpation to the cervical and lubosacral regions; mildly reduced range of motion on bilateral rotation; mildly reduced range of motion of the lumbar spine extension; positive straight-leg raise test, FABER test, and Gaenslen test on the right; and bilateral knee crepitus. Dr. Ahmad diagnosed Plaintiff with cervical radiculitis, neck pain, low back pain, lumbar radiculopathy, and knee degenerative joint disease. Dr. Ahmad noted that Plaintiff was already taking Percocet and Lyrica, and he prescribed flurbiprofen, cyclobenzaprine, baclofen, gabapentin, lidocaine, and a TENS unit. Dr. Ahmad also administered knee joint injections and recommended a repeat ESI in the lumbar spine. Dr. Ahmad's observations and treatment of Plaintiff's symptoms was consistent with the level of impairments he identified in the MMS.

Finally, contrary to the ALJ's finding that Dr. Ahmad's opinion was inconsistent with the record as a whole, Plaintiff's medical records are replete with consistent complaints of chronic neck, back, leg, and knee pain, as well as pain and weakness in her upper extremities. In July 2014, Plaintiff underwent cervical spine fusion, which temporarily improved, but did not resolve, her neck and upper extremity symptoms. While Dr. deGrange noted significant improvement in September 2014, his notes from October 2014 reflected only "some improvement in her neck and shoulder pain as well as the hand symptoms" and "some tingling that persists on the fingertips of both hands." Plaintiff renewed these complaints at her appointment with Dr.

deGrange in November 2014. By December 2014, Plaintiff's complaints of pain had increased significantly and she returned to Dr. Ahmad for pain management.

At Plaintiff's appointment with Dr. Ahmad in December 2014, she described neck and shoulder pain that radiated down the right arm and into her fingers, as well as low back pain that was "shooting" down her legs and past her knees. When Dr. deGrange examined Plaintiff that month, he noted bilateral arm weakness and numbness and tingling in the arms and fingers. NP McKeon's treatment notes from December 2014 revealed that Plaintiff described low back pain radiating to her buttocks, down her legs, and into her feet. Plaintiff informed NP McKeon that she was experiencing "little relief" from her pain medications, and NP McKeon observed that Plaintiff's had a decreased range of motion and paraspinal tenderness in her cervical spine area.

Dr. Ahmad's MSS was also consistent with Dr. deGrange's November 2014 opinion. There, Dr. deGrange opined that Plaintiff could occasionally lift/carry five to ten pounds; sit thirty to forty-five minutes; stand fifteen to twenty minutes; walk fifteen to twenty minutes; and view a computer screen fifteen to twenty minutes. (Id.) In regard to Plaintiff's upper extremities, Dr. deGrange limited her to occasional use of both hands for fine manipulation, reaching, and pushing/pulling.

Finally, Dr. Ahmad's opinion was consistent with Plaintiff's testimony and function reports. At the hearing, Plaintiff testified that her pain travelled down her neck, into her shoulders and biceps. She experienced intermittent, but regular, tingling and numbness in her arms and hands. Plaintiff estimated that she could walk about ten minutes before needing to take a break and sit down, sit for ten to fifteen minutes, and stand for ten to fifteen minutes. She stated she could not lift anything heavier than "a gallon of milk at the most," her arms "gave out" if she attempted to push or pull anything, and she could not "grip stuff."

In her function report of December 2014, Plaintiff stated she had difficulty dressing and combing her hair and could no longer cook, do household chores, open letters, or hold a book. (Tr. 197-204)   Likewise, Plaintiff's daughter completed a function report dated February 2015, which stated that Plaintiff had difficulty dressing, bathing, caring for her hair, using a knife, and cooking anything more than a frozen dinner. (Tr. 209-216)  Plaintiff's daughter estimated that Plaintiff could lift "10 lbs but that may be too much" and walk "3-5 maybe 7" minutes before needing to "catch breathe and get legs together."  (Tr. 214)

"Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."  Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Samons v. Astrue, 497 F.3d 813, 817 (8th Cir. 2007)).  Dr. Ahmad's opinion about the severity and debilitating effects of Plaintiff's impairments was entitled to substantial, if not controlling, weight because it was consistent with his own treatment notes, the treatment records of other providers, and Plaintiff's testimony about her own symptoms.   Indeed, substantial evidence supported Dr. Ahmad's opinion that Plaintiff's impairments caused her continuing and debilitating pain.  For these reasons, the ALJ's decision to discount Dr. Ahmad's opinion is not supported by substantial evidence.

2.  Dr. deGrange

Plaintiff also challenges the ALJ's decision to assign Dr. deGrange's November 2014 opinion "little weight" and his December 2014 opinion "great weight."  In response, Defendant asserts that the ALJ properly evaluated Dr. deGrange's opinions and substantial evidence supported the ALJ's finding that the December opinion was consistent with the record.

As previously discussed, in November 2014, Dr. deGrange completed a form for Plaintiff entitled "AT&T Integrated Disability Physical Capacities Evaluation."   On that form, Dr.

deGrange estimated that Plaintiff could sit thirty to forty-five minutes, stand fifteen to twenty minutes, and walk fifteen to twenty minutes. Dr. deGrange also stated that Plaintiff could: occasionally lift and carry a maximum of five pounds; occasionally use both hands for fine manipulation, pushing/pulling, and reaching; and continuously perform a simple grasp. Dr. deGrange noted these restrictions were permanent and "supersede[] previous statements of functional capacities," but stated that he would reassess Plaintiff's restrictions in December. (Tr. 406)

Dr. deGrange reassessed Plaintiff in December 2014. In his treatment notes, Dr. deGrange stated that Plaintiff "appears clinically to be much improved despite the subjective," but observed "some mild give-way weakness" in her arms. (Tr. 409) Unlike the November opinion, Dr. deGrange opined that Plaintiff's permanent limitations "plac[ed] her in a medium demand capacity as defined by the Department of Labor Dictionary of Occupational Titles."[6] (Id.) Dr. de Grange further stated that Plaintiff "would meet the criteria for a light/medium demand capacity indicating that on a constant basis she can lift, carry, push, and pull five pounds, frequently up to 15 pounds, and occasionally up to 25 pounds." (Tr. 409-10). Dr. deGrange did not explain his reason for finding that, in one month's time, Plaintiff's limitations on lifting/carrying, sitting, and walking/standing became significantly less restrictive.

The ALJ assigned the December opinion "great weight" and discredited the "much more restrictive" November opinion. (Tr. 17-18) The ALJ explained that she was according the

---

[6] Under the regulations, medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c). Light work, which the ALJ ultimately adopted for Plaintiff's RFC, "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds...[A] job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

December opinion great weight because those findings were "consistent with the evidence" and Dr. deGrange was a board-certified orthopedic surgeon who "as the treating source, [was] very familiar with the claimant's limitations." (Id.) In support of her decision to discount the November opinion, the ALJ wrote:

> An earlier opinion from Dr. deGrange dated November 4, 2014, in conjunction with the claimant's claim for short-term disability from her employer before she was released and while she was recuperating. It was much more restrictive. Although he indicated the restrictions were permanent, he also indicated that the restrictions would be reassessed in December and, therefore, the subsequent opinion essentially rejects the prior limitations and therefore it is entitled to little weight.

(Tr. 18)

The ALJ failed to provide any support for her conclusory statement that the December opinion was consistent with the evidence. To the contrary, Plaintiff's records reveal that she consistently complained of weakness, pain, tingling, and numbness in her arms, hands, and fingers, including at her appointments with Dr. deGrange in October, November, and December. Neither Dr. deGrange nor the ALJ identified any medical reasons for finding Plaintiff was capable of light or medium work when, one month earlier, Dr. deGrange had limited Plaintiff to lifting/carrying five pounds, standing or walking fifteen to twenty minutes, and sitting thirty to forty-five minutes. Moreover, Plaintiff's subsequent medical records reflected that her condition deteriorated rather than improved.

Nor did the ALJ provide "good reasons" for assigning Dr. deGrange's November opinion "little weight." As previously discussed, Dr. deGrange's November opinion was consistent with Dr. Ahmad's opinion, as well as the objective medical evidence, treatment records, and Plaintiff's testimony. "Confronted with a decision that fails to provide 'good reasons' for the weight assigned to a treating physician's opinion, the district court must remand." Land v.

<u>Berryhill</u>, 2017 WL 4236976, at *7 (E.D. Mo. Sep. 25, 2017) (quoting <u>Clover v. Astrue</u>, 4:07-CV-574-DJS, 2008 WL 3890497, at *12 (E.D Mo. Aug. 19, 2008)).

### 3. Conclusion

For the above reasons, the Court finds that the ALJ failed to properly weigh Dr. Ahmad's and Dr. deGrange's opinions and thus failed to properly assess Plaintiff's disability claim such that substantial evidence did not support the ALJ's determination.[7] <u>See, e.g.</u>, <u>Gordon v. Astrue</u>, 801 F.Supp.2d 846, 859 (E.D.Mo. 2011).

Though the Court does not make the ultimate determination regarding Plaintiff's disability, the Court finds this case should be reversed and remanded. On remand, the ALJ is directed to properly evaluate and weigh the medial opinion evidence; formulate a new RFC for Plaintiff based on the medical evidence in the record; further develop the record if necessary; and proceed with the next steps of the sequential evaluation.

**IT IS HEREBY ORDERED** that this action is **REVERSED AND REMANDED** to the Commissioner pursuant to sentence four 42 U.S.C. § 405(g) for further consideration in accordance with this Memorandum and Order.

A separate judgment with accompany this order.


_Patricia L. Cohen_
_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 16th day of September, 2019

---

[7] Because the ALJ erred in evaluating the medical opinion evidence, the Court addresses only that issue. <u>See</u> <u>Western v. Berryhill</u>, No. 1:16-cv-49 JAR, 2017 WL 1407118, at *3 (E.D. Mo. Apr. 20, 2017).